# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

*Murphy v. Advocate Health & Hospitals Corp.*, 2017 IL App (4th) 160513

</div>

| | |
|---|---|
| Appellate Court Caption | PATRICK B. MURPHY, M.D., Plaintiff-Appellant, v. ADVOCATE HEALTH AND HOSPITALS CORPORATION, d/b/a Advocate BroMenn Medical Center, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-16-0513 |
| Filed | March 7, 2017 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 16-CH-122; the Hon. Mark A. Fellheimer, Judge, presiding. |
| Judgment | Reversed; cause remanded. |
| Counsel on Appeal | Jenna E. Milaeger (argued), Michael K. Goldberg (argued), and Robert A. Bauerschmidt, of Goldberg Law Group, LLC, of Chicago, and Terence B. Kelly, of Thompson & Weintraub, of Bloomington, for appellant.<br><br>Daniel J. Fumagalli, David J. Tecson (argued), and Ryan A. Haas, of Chuhak & Tecson, P.C., of Chicago, and Richard E. Stites and Kirk A. Holman, of Livingston, Barger, Brandt & Schroeder, of Bloomington, for appellee. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justice Appleton concurred in the judgment and opinion.
Justice Harris dissented, with opinion.


**OPINION**

¶ 1        In May 2016, the vice president for medical management of defendant, Advocate Health and Hospitals Corporation, d/b/a Advocate BroMenn Medical Center (BroMenn), told plaintiff, Patrick B. Murphy, M.D., that his clinical privileges had been summarily suspended, which effectively ended Murphy's authorization to practice medicine at BroMenn. Shortly thereafter, BroMenn reinstated Murphy's privileges based on a mutual agreement that Murphy would refrain from using those credentials during BroMenn's further inquiry into the matter.

¶ 2        In June 2016—after Murphy alleged that BroMenn failed to comply with various medical staff bylaws when summarily suspending his privileges—BroMenn's medical staff executive committee voted to reinstate Murphy's summary suspension. Later that month, in response to Murphy's request, an "intraprofessional conference" comprised of a hearing officer and a panel of five medical professionals considered whether Murphy's summary suspension was warranted. The conference panel later recommended that BroMenn's governing council maintain the summary suspension of Murphy's privileges, which the council accepted.

¶ 3        Thereafter, Murphy filed a motion requesting an emergency temporary restraining order and preliminary injunction against BroMenn. In his prayer for relief, Murphy sought (1) a declaratory finding that the May 2016 summary suspension of his privileges "violated state law and is null and void" and (2) a temporary, preliminary, and permanent injunction prohibiting BroMenn from enforcing or reporting the summary suspension of his privileges. Following a July 2016 hearing, the trial court denied Murphy's motion for declaratory and injunctive relief.

¶ 4        Murphy appeals, arguing that the trial court erred by denying his motion for declaratory and injunctive relief. Pertinent to this appeal is Murphy's contention that BroMenn failed to follow the proper procedure provided by its medical staff bylaws when summarily suspending his privileges. For the reasons that follow, we reverse.


¶ 5                                    I. BACKGROUND
¶ 6                    A. The Pertinent Provisions of BroMenn's Medical Staff Bylaws
¶ 7        As noted, the pertinent issue on appeal concerns the proper procedure for summarily suspending a physician's privileges, which Murphy alleges BroMenn violated by not following its medical staff bylaws. Thus, in addition to tailoring our ensuing discussion regarding the pertinent circumstances of Murphy's claim, we quote the following pertinent provisions of BroMenn's medical staff bylaws to provide context.

¶ 8        Article VIII, section II, titled "Summary Suspension," provides, in part, as follows:
                "Any two or more of the following individuals, acting together, shall be deemed to
                be a duly recognized Emergency Action Sub-Committee of the Executive Committee
                or the Governing Council: the Medical Staff President, the Chair of a clinical

Department, [or] the President of [BroMenn's] Medical Center. The Emergency Action Sub-committee has the authority to summarily suspend, based on documentation or other reliable information, the Medical Staff membership status or all or any portion of the clinical privileges of a member or privileges holder whose conduct or continuation of Practice presents an immediate danger to the public ***. The summary suspension is effective immediately upon imposition.

A. REVIEW OF SUMMARY SUSPENSION. As soon as reasonably possible, the Executive Committee shall meet to review the documentation upon which the summary suspension is based, and recommend whether it should be affirmed, lifted, expunged, or modified. If the Executive Committee recommends that the summary suspension be lifted, expunged[,] or modified, that recommendation must be reviewed by the Governing Council, or a committee of the governing Council, on an expedited basis.

After summary suspension is imposed, the affected practitioner summarily suspended shall be entitled to written notification thereof which shall be deposited in the U.S. mail addressed to his or her last known address. The affected practitioner shall be entitled to request an Intraprofessional Conference under Article IX to contest the suspension. *** The Intraprofessional Conference, if requested, will be conducted within *** (15) days from the effective date of the summary suspension unless otherwise determined by mutual agreement of the parties."

¶ 9    Article IX, section I, titled "Right of Intraprofessional Conference," provides, as follows:

"A. The Hospital President shall give an effected [*sic*] member or, in circumstances that could result in a National Practitioner Data Bank report, an applicant, written notice of any adverse action, defined in Section II of this Article. The notice shall also state the reasons for the adverse action, including any and all economic factors therefore, the right of the affected individual to request an Intraprofessional Conference as described in these Bylaws, the [30-] day deadline within which the Intraprofessional Conference must be requested, and the rights available in the Intraprofessional Conference."

Article IX, section II(A), classifies the reduction, suspension, or revocation of clinical privileges as an adverse action.

¶ 10    Article IX, section IV, titled "Initiation of Conference Process," provides, in pertinent part, as follows:

"A. As soon as is reasonably practicable after receipt of such request, the Hospital President shall schedule the Conference and shall notify the affected individual in writing, return receipt requested, of the date and time the Conference is to take place, as well as its location along with a list of witnesses expected to testify. In no event other than summary suspension[ ] [s]hould the date for the Conference be set less than *** (30) days nor more than *** (50) days from receipt of request for such Conference unless otherwise agreed to by the parties.

B. The affected individual is entitled, upon timely and advanced written request, to inspect all pertinent and non-privileged information in the Hospital's possession prior to the Intraprofessional Conference.

***

D. The affected individual shall be entitled to representation by legal counsel or by any individual of the subject's choice in any phase of the hearing and shall receive notice of the right to obtain such representation. The medical executive committee shall appoint a representative to present its action or recommendation, the materials in support thereof, examine witnesses, and respond to appropriate questions, and may be represented by legal counsel in place of or in addition to such representation."

¶ 11 Article IX, section VI(C), which appears under the title "Rules of Procedure," provides that "[t]he Committee and the affected individuals both have the right to call and cross-examine witnesses during the Conference."

¶ 12 **B. BroMenn's Initial Notice to Murphy Regarding the**
**Summary Suspension of His Privileges**

¶ 13 On the evening of Friday, May 20, 2016, Dr. James Nevin, Jr., BroMenn's vice president for medical management, verbally informed Murphy, a board-certified physician in cardiology and interventional cardiology, that his privileges—through which Murphy had practiced medicine at BroMenn since 1994—had been summarily suspended. Nevin's decision originated from a meeting conducted earlier that day, during which he and three other physicians discussed the medical care Murphy provided to E.W. from May 11, 2016, to May 14, 2016, when E.W. died of cardiogenic shock. In a May 23, 2016, letter, the president of BroMenn's medical staff, Dr. Mark J. Hanson, provided Murphy the following notice: "This letter is to notify you that, upon review of a quality concern, it has been determined that a summary suspension be imposed effective May 20, 2016. If you have any questions, please contact me."

¶ 14 **C. The Special Meeting of BroMenn's Executive Committee**
**and the Governing Council's Subsequent Approval**

¶ 15 (The following synopsis was gleaned from minutes documenting a special meeting of BroMenn's executive committee.)

¶ 16 The same day that Hanson sent his letter to Murphy, Hanson chaired a special meeting of BroMenn's executive committee to determine whether to "affirm, lift, expunge, or modify" the summary suspension of Murphy's privileges. The chair of medicine for BroMenn's medical staff, Dr. Chae Chu—who was present at the May 20, 2016, meeting—provided the executive committee a technical summary of the medical care Murphy administered to E.W. from May 11, 2016, to May 14, 2016. Following that summation, Chu noted the following deficiencies: (1) the absence of any documentation concerning the May 12, 2016, cardiac catheterization procedure Murphy performed on E.W.; (2) a delay in the bedside evaluation of E.W.'s status; (3) an inappropriate response to clinical findings; and (4) Murphy's refusal to consult with an intensive care unit (ICU) physician who had requested to confer with Murphy about the management of E.W.'s care.

¶ 17 Under the "Discussion" heading that documented the executive committee meeting was the following notation:

"Of note, there were two quality cases reviewed in 2015, one determined to be [an opportunity for improvement]. There are two other cases currently in the peer review process and another case (aside from this one) which will be submitted for review.

- 4 -

Summaries of [eight] Incident reports from [December 10, 2015, to] Friday's event were included in the information provided to the [executive] committee."

(The term "Friday's event," may refer to Friday, May 13, 2016, the last day Murphy provided E.W. medical care, or Friday, May 20, 2016, the day Nevin told Murphy that his privileges had been summarily suspended.)

¶ 18 The executive committee also discussed the possibility that "the recent number of quality events, after 20 years of practice, could be indicative of an issue in *** Murphy's personal life." An executive committee member added that because the lack of medical documentation was a historical critique of BroMenn's cardiology department, the executive committee should not affirm Murphy's summary suspension on that basis. Thereafter, the executive committee decided to (1) "lift the suspension imposed on Friday, May 20[, 2016]," and (2) refer the matter to the "productive interaction process." In so doing, the executive committee planned to seek Murphy's voluntary commitment to refrain from using his privileges until completion of the productive interaction. (As described in Article III, section V(B), of BroMenn's medical staff bylaws, a "productive interaction" may be utilized as a means of resolving behavioral, clinical, or administrative issues, which does not involve an investigation or hearing that implicates procedural rights.)

¶ 19 On May 24, 2016, BroMenn's governing council reviewed and approved the executive committee's determination to reinstate Murphy's privileges, which remained contingent on Murphy's commitment to refrain from using those credentials until completion of the productive interaction.

¶ 20 D. BroMenn's Notification

¶ 21 On May 25, 2016, Murphy met with Chu and agreed verbally that he would not use his privileges during the pendency of the productive interaction. That same day, Hanson sent Murphy a letter, stating as follows:

"As *** previously notified verbally on *** May 20, 2016[,] and followed by my letter dated May 23, 2016, your *** privileges were summarily suspended at *** BroMenn ***. Pursuant to the Medical Staff Bylaws, this action was reviewed by the *** Executive Committee *** and the Governing Counsel of BroMenn.

The [Executive Committee] recommended and the Governing Council concurred that the summary suspension should be lifted. Therefore, your *** privileges are no longer suspended. However, the Governing Counsel requested, and you have agreed, that you will voluntarily not exercise your *** privileges pending a peer review investigation by BroMenn related to clinical concerns that have been raised. In addition, the Productive Interaction Process will be initiated.

At this time[,] no events have occurred that entitle you to a fair hearing pursuant to the Medical Staff Bylaw. I understand a copy of the Bylaws was provided to you via email this morning."

¶ 22                    E. The Executive Committee's Subsequent Summary
                        Suspension of Murphy's Privileges

¶ 23                    1. *Murphy's Expressed Intent to Exercise His Privileges*

¶ 24        Shortly thereafter, Murphy retained counsel. (Unless otherwise noted, all further references to Murphy should be considered actions taken on his behalf by his retained counsel.) On May 31, 2016, Murphy sent Hanson a letter, stating that he would not voluntarily relinquish his privileges. Murphy based his decision on BroMenn's alleged failure to establish that an immediate danger existed as required by section 10.4 of the Hospital Licensing Act, which provides that "[a] summary suspension may not be implemented unless there is actual documentation or other reliable information that an immediate danger exists." 210 ILCS 85/10.4(b)(2)(C)(i) (West 2014).

¶ 25        In a separate correspondence, which was also dated May 31, 2016, Murphy demanded that BroMenn immediately expunge any reference to the summary suspension from his medical staff record, emphasizing the following alleged deficiencies:

> "*To date, BroMenn has provided no written notice *** of an actual documented immediate danger necessitating the summary suspension, any written notice of the alleged reason(s) for the summary suspension, or [Murphy's] right to request a hearing on the summary suspension in violation of the Bylaws and [Act]*." (Emphasis in original.)

Murphy added that BroMenn's documentation concerns could not substantiate an immediate danger.

¶ 26                    2. *The Executive Committee's Response to Murphy's*
                        *Expressed Intent to Exercise His Privileges*

¶ 27        On June 1, 2016, Hanson informed Murphy by letter that the executive committee had convened earlier that day and voted to summarily suspend Murphy's privileges effective immediately. The executive committee found that the care Murphy provided to E.W. during May 13-14, 2016, "raises such significant concerns regarding your medical judgment and ability to practice medicine, that it has been determined that continued medical practice by you at [BroMenn] poses an immediate danger to its patients." In support of its decision, the executive committee listed the following deficiencies: (1) the absence of documentation of cardiac catheterization images or reports of cardiac catheterization intervention; (2) inappropriate treatment for cardiogenic shock; (3) delay in bedside evaluation of a critically ill patient; (4) inappropriate response (E.W. was hypotensive for over 17 hours without effective treatment) and an inadequate conclusion of the cause of E.W.'s cardiac arrhythmias (Murphy allegedly told an attending nurse that E.W.'s death was caused by the administration of Benadryl and Xanax); (5) refusal to consult with an ICU physician about E.W.'s medical management and, instead, instructing the nurse to call Murphy only for orders regarding E.W.'s care; (6) lack of medical knowledge and decision; (7) poor judgment and management of critical labs and medical condition; and (8) improper administration of a specific medication. The executive committee noted that "in addition[,] in the past 18 months, *** Murphy has had [four] peer review cases and [10] other reports for inadequate documentation and/or management."

¶ 28          F. The Request and Response for an Intraprofessional Conference

¶ 29          1. *Murphy's Request for an Intraprofessional Conference and Relevant Information*

¶ 30     On June 2, 2016, Murphy sent a letter addressed to Hanson in which he requested an intraprofessional conference on BroMenn's decision to summarily suspend his privileges. In making that request, Murphy stated the following:

> "Please be advised that this request for [intraprofessional] [c]onference assumes that all documentation on which the summary suspension is based has been provided to *** Murphy *** expeditiously. *** The [c]onference will be rendered useless if *** Murphy is not provided with all the documentation on which the summary suspension was based and given an opportunity to review said documentation in advance of the [c]onference. A written request for said documentation has been submitted to [BroMenn's] Associate General Counsel *** today."

¶ 31     On June 6, 2016, Murphy sent a written request addressed to BroMenn's retained counsel and BroMenn's associate general counsel requesting the following documentation:

> "1. All minutes of all medical staff and/or hospital meetings at which *** Murphy and/or his medical staff membership and/or [his] clinical privileges have been discussed since he joined the medical staff at *** BroMenn ***;
>
> 2. *** Murphy's credential/personnel file at *** BroMenn ***;
>
> 3. All internal or external reviews of any of *** Murphy's medical charts or patient care rendered by *** Murphy;
>
> 4. All internal and external medical staff or hospital communications about *** Murphy;
>
> 5. All witness statements gathered during any investigation of *** Murphy;
>
> 6. A copy of any report(s) of any autopsies performed on *** E.W. and if none exists, a description of the cause of death *** and/or the *** [e]xecutive committee's conclusion as to the suspected cause of death of *** E.W.;
>
> 7. The names of the members of the 'Emergency Action Sub-Committee' that initiated the summary suspension under Article VIII, Section II of the [m]edical [s]taff [b]ylaws and any reports, communications, memorandums[,] or other documents prepared by said committee to the summary suspension; and
>
> 8. A list of any and all witnesses that the *** [e]xecutive [c]ommittee intends to present and all documents that will be introduced at the [i]ntraprofessional [c]onference."

¶ 32          2. *BroMenn's Response to Murphy's Request for an Intraprofessional Conference*

¶ 33     On June 7, 2016, BroMenn's medical center president, Colleen Kannaday, informed Murphy by letter that BroMenn had scheduled a June 10, 2016, intraprofessional conference to either confirm or overturn the executive committee's summary suspension of Murphy's privileges. In her letter, Kannaday identified, by name, (1) the intraprofessional conference panel members and (2) seven witnesses BroMenn expected to solicit testimony from at the conference. Although Kannaday's correspondence mentioned that Murphy had the right to

"[i]nspect all pertinent and non-privileged information in [BroMenn's] possession *** with respect to the decision which is the subject of the [conference]," Kannaday's letter did not otherwise acknowledge Murphy's June 6, 2016, letter requesting the aforementioned documentation.

¶ 34                              3. *BroMenn's Disclosures*

¶ 35        On June 9, 2016, BroMenn identified 13 exhibits it intended to introduce at the intraprofessional conference. Exhibits 1 to 9 concerned primarily the aforementioned correspondences exchanged between Murphy and BroMenn between May 23, 2016, and June 7, 2016. The minutes of the May 23, 2016, special meeting of BroMenn's executive committee were also included in the nine exhibits. The remainder of BroMenn's exhibits were as follows: (1) exhibit 10 contained E.W.'s medical records; (2) exhibit 11 showed "peer review worksheet[s]" for two unidentified patients, which summarized the care provided to each patient in December 2014 and April 2015, respectively; (3) exhibit 12 disclosed eight "Midas" reports (the Midas reports appear to be brief excerpts extracted from medical charts, summarizing the care provided to unidentified patients from December 2015 to May 2016); and (4) exhibit 13 included medical records of a patient identified as M.A. In a June 2016 affidavit, Mary S. Matthews, BroMenn's associate general counsel, averred that BroMenn provided Murphy (1) E.W.'s medical records on June 2, 2016, (2) exhibits 12 and 13 on June 7, 2013, and (3) exhibit 11 on June 9, 2016. (We note that two of the four peer review cases and 2 of the 10 Midas reports that BroMenn relied upon in summarily suspending Murphy's privileges were not provided to Murphy and not included in the record on appeal.)

¶ 36                           a. The Peer Review Worksheets

¶ 37        We note that the peer review reports at issue do not provide the identities of the respective personnel involved. However, as disclosed by BroMenn in its brief to this court, exhibit 13, which contained the medical file of a patient identified as M.A., is the 92-year-old patient reflected in the December 2014 peer review case we now summarize.

¶ 38                    i. *The Peer Review of the December 2014 Medical Case*

¶ 39        On July 7, 2015, BroMenn sent Murphy an unsigned letter stating that in an effort to comply with its commitment to provide "safe, high quality patient care," BroMenn had approved "14 quality indicators that determine which cases were peer reviewed." (BroMenn's correspondence did not further specify the 14 factors.) BroMenn informed Murphy that the attached December 2014 medical case "met the medical staff criteria for peer review." The description section of the peer review worksheet listed the following: "Possible no follow up of diagnostic result." BroMenn informed Murphy that "the Medical Care Evaluation Committee" (MCE) would convene in August 2015 to discuss the case and urged Murphy to provide any additional information or comments that would be "helpful to assess this case."

¶ 40        The attached peer review worksheet provided information regarding the December 6, 2014, hospital admission of a 92-year-old patient who had fractured her hip, noting that the patient had a "significant medical history." The following day, cardiology cleared the patient for surgery. On December 8, 2015, the patient presented with symptoms that prompted calls to a hospitalist, orthopedic surgeon, and cardiologist. The resulting cardiology note described the medical issue, as follows:

- 8 -

" 'Troponins were mildly elevated earlier, but no evidence of any significant [electrocardiogram] changes or chest pain. We will continue to follow [patient] clinically at this point in time. I think with transient anemia after operation, there may have been very minimal cardiac embarrassment, but no significant [*sic*] at this point in time. We will continue to follow along.' "

¶ 41    A nursing note documented that on the evening of December 10, 2014, the cardiologist was notified that the patient was "in and out of junctional rhythm with a rate of 50s-60's and dropped to 38 [beats per minute] at one time," the orders received were to "continue to monitor and update physician through the night." The following day, a nursing note documented a phone call between the hospitalist and cardiologist in which the hospitalist acknowledged that the patient had elevated test results that cardiology would "monitor closely." Later that evening, the hospitalist ordered the cessation of cardiac and electrocardiogram monitoring. On the morning of December 12, 2014, the patient was intubated after becoming unresponsive and pale. Family members requested the cessation of resuscitative efforts, and the patient died later that morning.

¶ 42    On August 24, 2015, BroMenn sent the following letter to Murphy, stating, in pertinent part, the following regarding the December 2014 medical case:

"This case was initially reviewed by a peer, sent to you for your response, and was subsequently submitted to the MCE. The MCE decision is the final determination.

*An Opportunity for Improvement (OFI) was identified* by the [MCE]. This information is placed in your quality file in the Department of Medical Affairs to document the outcome of the review. These files are protected under the Illinois Compiled Statutes and therefore cannot be accessed by anyone outside of [BroMenn].

This correspondence is intended for your information only." (Emphasis in original.)

The OFIs listed concerned the (1) "[o]pportunity to improve legibility of documentation and (2) opportunity for better communication with patient/family or members of the medical team." The peer review evaluation also noted that "no significant care variation" was shown as the "[patient was] high risk to begin with."

¶ 43                              ii. *BroMenn's Peer Review of the April 2015 Medical Case*

¶ 44    On September 4, 2015, BroMenn sent Murphy a letter which was substantially similar to the July 7, 2015, letter BroMenn had sent to Murphy, alerting him to the peer review of an April 2015 medical case. The "Description" section of the peer review worksheet listed the following: "Death, Possible PE following procedure." BroMenn informed Murphy that the MCE would convene in September 2015 to discuss the case and urged Murphy to provide any additional information or comments.

¶ 45    The attached peer review worksheet provided information on the April 16, 2015, arrival of a 58-year-old man complaining of chest pain that had been ongoing for two hours. At a subsequent procedure performed that day, angioplasty and stents "were deployed" to the patient's right coronary and distal circumflex artery, with no relief to the patient's pain. A second procedure deployed a stent to the left anterior descending artery and resolved the patient's pain. No complications were observed and the patient was admitted to BroMenn later that afternoon. Sometime thereafter, the patient's friend alerted medical staff that the patient

could not breathe. Patient had a purple face and no pulse. Resuscitation efforts were not successful.

¶ 46    On October 21, 2015, BroMenn informed Murphy by letter that a peer review of the April 2015 case did not identify any OFIs.

¶ 47                              b. The Midas Reports

¶ 48    As previously noted, the eight "Midas" reports contained brief summaries detailing medical care for unidentified patients from December 2015 to May 2016. (We note that any reference to "Braastad" in the following Midas reports is to Dr. Robert Braastad, a cardiologist with 21 years experience, who is chair of BroMenn's department of cardiology and director of BroMenn's cardiac catheterization laboratory.)

¶ 49    A sampling of those reports contains the following information:
    "1/20/2016 2:43 AM by NOT AUTHENTICATED

    [Patient] was to have a [catheterization] on 1/13. There is a nursing communication, that on day of [catheterization], to hold ACE inhibitors and ARBs if creatinine is >1.5 or GFR <60. [Patient] did receive dose that morning when [creatinine] was 1.5 and GRF was 33. Unsure whether this influenced AKI.

    Refer to Chair CHU &? Braastad for Peer Review[.]

        12/10/2015 7:55 PM by NOT AUTHENTICATED

    Patient admitted to floor past scheduled cardiac [catheterization] with no home medications addressed by physician. Home medication list was entered by RN in [catheterization] lab.

    Refer to Chair—CHU[.]

        12/10/2015 7:51 PM by NOT AUTHENTICATED

    Patient came back from [catheterization] lab with no post [catheterization] orders.

        12/10/2015 7:49 PM by NOT AUTHENICATED

    After receiving report it was ordered that patient was scheduled for a cardiac [catheterization] at 0800 and that patient had an allergy to contrast with no orders on the chart for allergy. Night shift was aware of [catheterization] time and no [intravenous (IV)] fluids had been started because there were no orders for those either. This [registered nurse (RN)] did an override for IV fluids, looked up contrast allergy protocols, did an override on those, and paged the physician. *** Murphy promptly called back. I told him all the medications I pulled and asked if he was ok with them. As IV fluids were started[,] it was noted that the patient[']s IV was infiltrating. IV fluids were stopped and a new IV was attempted by this RN x 2. [Three] other RNs attempted to start an IV. Patient ended up being stuck [eight] times before we were successful. All these setbacks delayed the patient[']s care. The allergy protocol and new IV and fluids could have been started long before day shift.

    Refer to Chair CHU &? Braastad

        4/15/2016 12:58 PM by NOT AUTHENTICATED

    Patient admitted *** for Chest Pain 4/13/2016 ay 20:09. As of 1200 today (4/15) this patient has not yet been seen by admitting physician, *** Murphy. Verbal discussion from the staff is that *** Murphy wants to do a cardiac [catheterization]. Unable to do

- 10 -

it on 4/14 due to his schedule. No orders for the [catheterization] but it was communicate[d] by the office to the [catheterization] lab that the [catheterization] is to be done at 1430 on 4/15. There is no evidence *** that indicated this patient has seen [*sic*]. Text message regarding situation sent to *** Murphy by *** Nevin."

¶ 50                                G. The Intraprofessional Conference

¶ 51     At the June 10, 2016, intraprofessional conference, Murphy was represented by retained counsel Gerald G. Goldberg, Michael K. Goldberg, and Jenna Milaeger. BroMenn was represented by retained counsel David J. Tecson. Also present on BroMenn's behalf was Mary S. Matthews, BroMenn's associate general counsel. Retired Judge Donald Bernardi presided over the conference as the hearing officer. During the intraprofessional conference, the five-member medical panel was tasked with either affirming, lifting, expunging, or modifying the executive committee's June 1, 2016, summary suspension of Murphy's privileges. Prior to the start of the conference, Bernardi noted that each of the five panel members had received a binder containing the 13 aforementioned exhibits. The committee members considered the following testimony.

¶ 52                                        1. *BroMenn's Evidence*

¶ 53     Chu, a pulmonary and critical care specialist, testified generally about his participation at the May 20, 2016, emergency meeting held with three other physicians and his aforementioned concerns regarding Murphy's treatment of E.W. Chu opined that (1) E.W. exhibited symptoms indicative of cardiogenic shock and (2) Murphy's failure to correctly identify and appropriately treat E.W.'s condition breached the expected medical standard of care. Chu acknowledged that he had also participated in the May 23, 2016, special meeting of the executive committee that lifted the summary suspension imposed three days earlier, which was contingent on Murphy's agreement that he would not perform consults, admit patients, or perform any surgical procedures at BroMenn during the productive interaction. Chu estimated that the productive interaction would have taken about two weeks to complete.

¶ 54     The following exchange then occurred during Chu's testimony:

     "[TECSON]: *** I'd like to redirect your attention back to the meeting of May 20, [2016].

     Aside from [E.W.'s] case, were there any other cases or issues discussed related to *** Murphy?

     GERALD GOLDBERG: Objection ***. Those are not the subject matter of the summary suspension. There's one case we are here for, a death case. That's it. No other cases.

     TECSON: Judge, I disagree. *** This all started with the May 20[, 2016,] meeting. So it's a valid question, which is: Were there any other issues discussed?

     *** [T]he [June 1, 2016,] summary suspension letter[,] *** point 9 says: 'In addition, in the past 18 months, *** Murphy has had [4] peer review cases and [10] other reports for inadequate documentation and/or management.'

     I believe *** Chu is about to testify that, as of May 20 [, 2016,] other cases were discussed.

- 11 -

BERNARDI: *** Is it your position that that formed part of the basis for the summary suspension?

TECSON: Yes.

BERNARDI: And it's your position that that's kind of outside the scope of what should be considered?

GERALD GOLDBERG: Absolutely. It's outside of the scope and doesn't follow the bylaws.

BERNARDI: How is it not following the bylaws?

GERALD GOLDBERG: Well, you have to express the cases. You have to give the names of the cases. You have to state what the emergency situation is for the summary suspension, and you have to give a description of the incident itself. Otherwise, there is no notice whatsoever, especially when it's summary suspension, your Honor.

If you look at the summary suspension section *** you have to give this notice. You must give this notice.

***

BERNARDI: *** What notice do you mean?

GERALD GOLDBERG: Notice of Summary Suspension, June 1[, 2016]. It has to *** identify patients. It has to give dates ***, times [and] what was wrong.

BERNARDI: Your saying [BroMenn] needed to be more specific?

GERALD GOLDBERG: It needed to be specific. And, your honor, I might add, so that we don't waste a lot of time, the cases that were given to us in the packet *** are all reviewed cases going back to mid[-]2015. They're completed cases. They've all been reviewed with no action taken.

So that's the basis for my saying this is kind of an add-on not-lawful pile-on. ***

Anybody that's had any incident at this hospital, you have a case, and it goes through the process. The case is closed, referred for counseling, whatever. These are closed cases. We can[not] stop and take a look at them ***. They're closed cases.

BERNARDI: Okay. The question is whether they would reasonably be relied upon by the Committee—should they be reasonably relied upon.

MICHAEL GOLDBERG: I just want to add [that] the *** Act which covers this says: 'A summary suspension may not be implemented unless there's actual documentation or other reliable information that an immediate danger exists.[']

***

'This documentation or information must be available at the time the summary suspension decision is made and when the decision is reviewed.'

***

BERNARDI: *** What you just said sounded to me like, as long as they reviewed the cases at the time they made the decision, it's within the bylaws.

And I think you're arguing today that they aren't going to present that? Is that what you're saying?

MICHAEL GOLDBERG: [BroMenn has not] given it to us. We have no charts.

BERNARDI: So I think we have to hear the answer. I think we will let [Chu testify]."

¶ 55    Thereafter, Chu testified that at the May 20, 2016, emergency meeting, the members discussed (1) "cases that had been reviewed by the peer review process" during the past 18 months and (2) two other cases that had yet to be peer reviewed but had been raised within the past two months because of patient safety concerns. When Chu attempted to testify to the specific circumstances of one of those cases, the following exchange occurred:

"GERALD GOLDBERG: Objection ***. We don't have those records. Those records were not given to us. How can we defend that? We can't defend that.

BERNARDI: I'm not sure you are obligated to at this hearing. It strikes me that the decision that was made is what is at issue. [BroMenn is] providing *** the basis for it, and it either is or is not going to be adequate in the future.

But I think your record is made that you object to this type of description of the peer review cases that they relied upon for the suspension.

GERALD GOLDBERG: Judge, how can I cross-examine *** Chu as to his assertions? His assertions are going to be heard, and I can't cross-examine them. The bylaws give us the right to cross-examine ***. I can't cross-examine [Chu's] statements without those records.

BERNARDI: That's essentially hearsay. That's a legal issue. I think that the Panel has to decide on the basis of this testimony and whoever else is presented whether or not the suspension was appropriate based on the information they had.

We don't have a year or two for discovery. We can't provide all of those documents and then take [depositions] and everything else, as you know. This is just not that kind of proceeding.

I think you've adequately made a record on it. [Chu is] now going to describe these priors. You're going to be at a disadvantage in asking questions about them, but that will be reflected in the record; and the Committee members will hear your questions about it.

GERALD GOLDBERG: Why should [Murphy] be at a disadvantage?

BERNARDI: Because this isn't a case where we have discovery.

GERALD GOLDBERG: Judge, if under the law *** you must give specific information for summary suspension—[Chu] is being allowed to opine, to give medical reasons[ ] why these cases were reviewed, but [Murphy does not] have those cases.

So the record will show that *** Chu made a negative statement about *** Murphy's treatment. There's nothing [Murphy] can do about that. [Murphy] can't tell [the panel members to] [d]isregard your colleague's testimony. Your colleague made a mistake. Your colleague didn't tell you the name, the date, [or] the event.

That is why it's prejudicial and irrelevant ***. It's like saying[,] You did this or that, and it's wrong. His care was poor. He had these events. And in a summary suspension hearing, which is a deprivation prior to a hearing, these assertions are out there. [Murphy] can't respond.

If *** Chu says, 'On such and such a case, [Murphy] was dead wrong, and he did this and did that,' [Murphy] can't tell you if it's just [Chu's] misperception, if [Chu]

- 13 -

remembers incorrectly, and you can't review the record to see if [Chu's] telling the truth."

Bernardi overruled Murphy's objection, stating, "[Chu is] going to be able to testify, and you can ask whatever question you ask on cross."

¶ 56     Chu then testified about a case in which Murphy performed a cardiac catheterization on a patient. Chu explained that a cardiac catheterization involves inserting a wire through the groin to either investigate the anatomy of the coronary arteries or to perform a procedure to open up any blockages. "[A] couple of months" after Murphy performed the catheterization, the patient developed a pseudoaneurysm. See *Psueduoaneurysm: What Causes It?*, Mayo Clinic, http://www.mayoclinic.org/tests-procedures/cardiac-catheterization/expert-answers/pseudoaneurysm/faq-20058420 (last visited Feb. 20, 2017) (explaining that a pseudoaneurysm, referred to as a false aneurysm, occurs when the blood from an injured blood vessel wall is contained by the surrounding tissue, which can occur after a cardiac catheterization procedure). Murphy planned to perform surgery in a "nonemergent fashion" to correct that medical concern. After the patient was admitted for observation, the pseudoaneurysm grew by two centimeters, necessitating "emergent intervention." After consultation with a cardiovascular surgeon, Murphy opted to immediately perform the procedure. Chu opined that BroMenn "felt that there was an error in judgment initially as to the importance of immediate intervention for something that could potentially be life threatening." Chu also described a second case in which Murphy performed a surgical procedure and that, in Chu's opinion, Murphy failed to provide appropriate postoperative care.

¶ 57     Chu confirmed that the following events occurred during the May 23, 2016, executive committee meeting: (1) Chu detailed E.W.'s case, (2) the executive committee members had electronic access to E.W.'s medical charts, (3) extensive discussion occurred among the executive committee members regarding E.W.'s case, and (4) summary sheets of the two other cases referred to at the May 20, 2016, emergency meeting were provided to executive committee members, which they then discussed.

¶ 58     Braastad testified that he was present at the May 20, 2016, emergency meeting and recalled that the subject concerned allegations regarding Murphy's delay and questionable responses with regard to E.W.'s treatment. Braastad explained that on May 11, 2016, Murphy performed an initial diagnostic cardiac catheterization, which contained all the appropriate images expected. The next day, Murphy performed an "interventional" procedure in which "there were several of the diagnostic images present but really no documentation of the interventional procedure itself." Braastad explained that documentation is important for reference and evaluation purposes.

¶ 59     Braastad then provided the following evaluation of the interventional procedure Murphy performed:

> "The initial procedure involved stent implementation, eventually to the left main. If you looked at the films, [in] my opinion ***, the whole left main extending all the way down into what we call the circumflex artery [is] heavily calcified [and] very angulated. The artery beyond the area of the lesion [is] a very small, diffusely diseased vessel.

                                                   * * *

- 14 -

The stent *** was positioned into the left main. It didn't really extend into the circumflex that I can tell. *** [C]ertainly [it was] not long enough to cover the extent of lesion that was there.

So *** the stent was positioned[,] but there was still, by my determination, a significant amount of disease beyond the stent that wasn't approached. *** [I]n my own estimation ***, I would not have done it."

¶ 60 Braastad opined that Murphy breached the standard of care because of his (1) lack of documentation, (2) "incomplete approach" to E.W.'s care, and (3) lack of postoperative care. Braastad noted that the ICU physician, who was located in Oakbrook, Illinois, requested to speak with Murphy about the management of E.W.'s care. Braastad's understanding was that the ICU physician recommended a treatment based on E.W.'s test results and wanted to confer with Murphy about certain laboratory tests and E.W.'s basic condition. Braastad acknowledged that (1) the treatment recommended by the ICU physician was administered to E.W. and (2) medical documentation did not exist to show that BroMenn updated Murphy on E.W.'s condition after midnight, approximately 4½ hours before E.W. died on May 14, 2016. Braastad acknowledged further that during the May 20, 2016, emergency meeting, discussions concerning a pseudoaneurysm case involving another patient were "briefly brought up."

¶ 61 Nevin's testimony concerned the eight aforementioned reasons why the executive committee voted on June 1, 2016, to summarily suspend Murphy's privileges. In addition, Nevin commented that at the May 20, 2016, emergency meeting, other cases besides E.W.'s case were discussed for the following reasons:

"Well, they mattered because at this point[,] we said: Has this risen to the level of a summary suspension, where we think there is a clear and present danger to patient safety[?]

The unanimous feeling was, yes, there is [a] major concern that the treatment has been inadequate.

At that point, in accordance with bylaws *** Hanson was contacted by phone[,] and *** the president of [BroMenn] was brought into the room. They were made aware of the three physicians feeling that there was a clear and present danger to patients because of a history of other reports that showed this as not just one aberrant happening.

In 18 months, there [were] four peer review cases. There were ten other reports of inadequate documentation. And based on this, the feeling was: Time out.

And so, in accordance with the bylaws, where the President of the Medical Staff or the President of the Hospital or the Chair of the Department—two of those three can decide that a summary suspension should occur. It was made at that point based on the feeling that this was not a single aberrant event."

¶ 62                                   *2. Murphy's Evidence*

¶ 63 Murphy testified that E.W. had been his patient for about nine years. On May 11, 2016, E.W., who was then 82 years old, complained to Murphy that he had been experiencing a shortness of breath. Murphy recalled that E.W. had the same complaint in January 2016, which resulted in a "cardiac intervention involving [a] vein graft." Murphy stated, "[b]ecause [E.W.] complained of the same symptoms that he had in January, it was my supposition that

- 15 -

potentially there had been recurrence of the disease in the vein graft ***, and [E.W.] was going to have a [catheterization] to evaluate whether or not that was the case." After performing that initial procedure on May 11, 2016, Murphy confirmed his suspicions and scheduled a cardiac catheterization, which he performed the following day.

¶ 64 In response to Braastad's critique of the May 12, 2016, cardiac catheterization procedure, Murphy agreed with Braastad's description about the extent of the diseased tissue, but he stated that he did not "attack or address it" because he "thought that that was much more an extensive intervention that I wanted to partake on [E.W.]" Murphy acknowledged the lack of a sufficient recording of the cardiac catheterization procedure, explaining that he forgot that he had to ask the technician to "hit the button each and every time" to trigger the recording process.

¶ 65 On May, 13, 2016, Murphy met with E.W. at approximately 2 p.m. and again that evening. During each encounter, Murphy confirmed that E.W.'s heart rate and rhythm were "regular." Although Murphy acknowledged that E.W.'s blood pressure was low, Murphy observed that E.W. sat up and interacted normally, was not dizzy or light-headed, and was lucid when responding to Murphy's inquiries. Murphy then detailed the calls he received from BroMenn's nursing staff and the orders he provided based on the nature of the issue presented. Sometime before midnight on May 13, 2016, Murphy received a call from the nursing staff regarding a concern expressed by an ICU physician that E.W. might be suffering from a "third degree heart block." Murphy ordered the nurse to apply an external pacemaker, which Murphy stated would ameliorate that condition. In response to the ICU physician's request to speak with Murphy, Murphy stated that he told the nurse that "if that's [the ICU physician's] concern, then that's my recommendation. *** If he has more concerns, then he can certainly call me back." Thereafter, Murphy did not receive any more calls regarding E.W.'s condition.

¶ 66                                    3. *Written Closing Statements*
¶ 67 At the close of evidence, the parties complied with the panel members' request to submit timely written closing statements.

¶ 68                                      a. Murphy's Statement
¶ 69 In his closing statement, Murphy briefly renewed his objection to the two peer review cases and numerous Midas reports introduced by BroMenn, which he maintained (1) were improperly admitted in violation of the medical staff bylaws and (2) "did not show a violation of any standard of care or otherwise indicate that *** Murphy is an immediate danger to the public or patients." Thereafter, Murphy summarized the evidence presented at the intraprofessional conference in support of his position that the medical care he provided to E.W. did not support the premise that Murphy presented an immediate danger to the public sufficient to substantiate the summary suspension of his privileges.

¶ 70                                     b. BroMenn's Statement
¶ 71 BroMenn's closing statement focused primarily on the underlying rationale, as testified to by Chu, Braastad, and Nevin, substantiating the summary suspension of Murphy's privileges. In this regard, BroMenn's closing statement summarized that "[t]he summary suspension of *** Murphy's privileges at *** BroMenn *** arose out of multiple concerns associated with

quality of care." BroMenn added that "[p]hysicians on the BroMenn medical staff met pursuant to the [b]ylaws on May 20, 2016, reviewed [E.W.'s] case and other quality concerns, and decided that *** Murphy presented an immediate danger to BroMenn patients." In substantiating that concern, BroMenn noted Nevin's testimony that the June 1, 2016, summary suspension of Murphy's privileges was "based on a review of the medical records associated with [E.W.], as well as the other peer review cases, and 10 other reports associated with inadequate documentation and/or management." After summarizing further the testimony provided at the June 10, 2016, intraprofessional conference, BroMenn urged the panel members to exercise their independent duty and affirm the summary suspension of Murphy's privileges.

¶ 72                     4. *The Intraprofessional Conference Committee's Determination*

¶ 73        On June 16, 2016, the intraprofessional committee issued its written decision, recommending that BroMenn's governing council maintain the summary suspension of Murphy's privileges. On June 24, 2016, the governing council accepted the intraprofessional conference committee's recommendation.

¶ 74                     H. Murphy's Request for Injunctive Relief

¶ 75        Thereafter, Murphy filed an amended complaint for declaratory and injunctive relief, raising numerous claims that challenged the fairness of the intraprofessional conference. In his prayer for relief, Murphy sought (1) a declaratory finding that the May 20, 2016, summary suspension of his privileges "violated state law and is null and void"; and (2) a temporary, preliminary, and permanent injunction prohibiting BroMenn from enforcing or reporting the summary suspension of Murphy's privileges.

¶ 76        Following a July 2016, hearing, the trial court denied Murphy's amended complaint for declaratory and injunctive relief. In so doing, the court found, in pertinent part, as follows:

> "With respect to the additional cases[, Murphy was] at least notified that [there were] additional issues. [The court] understand[s] *** Goldberg saying *** it should have been on [E.W.'s case] and no others. [The court] suspect[s] then if [BroMenn did not] tell [Murphy] that there's other things and [Murphy] show[s] up, why didn't [BroMenn] then let [Murphy] know in advance? So to [the court] it sounds like the E.W. case would provide an independent basis regardless of those other four cases being noticed up in the June 1st—it wasn't as if [BroMenn] showed up to the hearing and then threw in additional four cases when everyone is put on notice that there's additional issues that may come into play or that there was cross-examination regarding those issues and [witnesses] couldn't remember, they didn't know, and then the request is *** we need to continue this thing until we figure out what cases they are talking about in the first place."

Despite denying Murphy's amended complaint for declaratory and injunctive relief, the court granted Murphy's oral motion for a stay, enjoining BroMenn from satisfying any reporting requirements for seven days to permit Murphy time to request a stay from this court.

¶ 77        Later that month, Murphy filed with this court an emergency motion for an immediate stay of enforcement pursuant to Illinois Supreme Court Rule 305 (eff. July 1, 2004). Consistent with his representations to the trial court, Murphy requested that this court stay any mandatory

reporting requirements regarding the suspension of his clinical privileges during the pendency of this appeal. We later granted Murphy's emergency motion for an immediate stay, enjoining BroMenn from reporting the summary suspension of Murphy's privileges until further order of this court.

¶ 78    This appeal followed.

¶ 79                              II. ANALYSIS

¶ 80    Murphy argues that the trial court erred by denying his motion for declaratory and injunctive relief. Essentially, Murphy contends that he was denied a fair hearing because BroMenn failed to follow the proper procedure provided by its medical staff bylaws when summarily suspending his privileges. We agree.

¶ 81                    A. The Pertinent Provisions of the Act

¶ 82    Section 10.4(b) of the Act provides, as follows:

"All hospitals licensed under this Act *** shall comply with, and the medical staff bylaws of these hospitals shall include rules consistent with, the provisions of this Section in granting, limiting, renewing, or denying medical staff membership and clinical staff privileges." 210 ILCS 85/10.4(b) (West 2014).

¶ 83    Section 10.4(b)(2) of the Act states that the following "[m]inimum procedures" with respect to clinical privilege decisions of current members of the medical staff shall include (1) written notice of the adverse determination, (2) an explanation of the rationale underlying the adverse action including all considerations based on the quality of care, and (3) a statement of the medical staff member's right to request a fair hearing on the adverse action. 210 ILCS 85/10.4(b)(2)(A), (B), (C) (West 2014). "The opportunity for a fair hearing is required for any administrative summary suspension." 210 ILCS 85/10.4(b)(2)(C)(ii) (West 2014).

¶ 84                    B. The Limited Scope of This Court's Review

¶ 85    In *Lo v. Provena Covenant Medical Center*, 342 Ill. App. 3d 975, 982, 796 N.E.2d 607, 612-13 (2003), this court reiterated the following limits regarding an appellate court's review of a hospital decision to suspend a physician's clinical privileges:

"Courts are ill-qualified to run a hospital, but they can read and interpret bylaws. Therefore, when a physician sues over the suspension of a clinical privilege, the court will ask only one question: did the suspension violate any bylaw? *Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill. 2d 497, 506-07, 544 N.E.2d 733, 738 (1989). If the suspension violated no bylaw, the court will defer to the superior qualifications of the hospital officials who made the decision. *Adkins*, 129 Ill. 2d at 507, 544 N.E.2d at 738."

¶ 86                    C. The June 2016 Intraprofessional Conference
¶ 87                              1. *The Stakes at Issue*
¶ 88    We acknowledge the important competing rights that must be balanced between (1) BroMenn's right to summarily suspend a physician, whose continued practice—in its expert medical opinion—presents a danger to the public with (2) the inevitable harm to the physician's reputation and livelihood that necessarily results from the suspension of clinical privileges. See *id.* at 983, 796 N.E.2d at 614 ("Section 10.4(b)(2)(C)(i) [of the Act] plainly

presupposes that the hospital has an inherent right to summarily suspend the clinical privileges of a physician whose continued practice poses an immediate danger to patients."); *see also Larsen v. Provena Hospitals*, 2015 IL App (4th) 140255, ¶ 29, 27 N.E.3d 1033 (the decision not to renew a physician's privileges negatively impacts the physician's professional reputation and future income).

¶ 89    As the supreme court noted in *Adkins*, 129 Ill. 2d at 509, 544 N.E.2d at 739, "a private hospital's actions do not constitute State action and therefore are not subject to scrutiny for compliance with due process protections." The supreme court, however, continued, as follows:

> "Though a physician practicing in a private hospital may not have a right to the procedural protections assured by the due process clause, there are certain basic protections which must be accorded a doctor subject to a disciplinary action which could seriously affect his or her ability or right to practice medicine. [Citations.] Such basic protections include notice and a fair hearing. [Citation.]" *Id.* at 509-10, 544 N.E.2d at 739.

¶ 90    The supreme court's guidance in *Adkins*, coupled with the aforementioned limited standard of review, guides our consideration. We earlier provided in this opinion extensive detail on the evidence presented in support of BroMenn's decision to summarily suspend Murphy's privileges to provide context. In resolving this appeal, we express no opinion regarding (1) whether the care Murphy provided E.W. fell below the medical standard of care for a cardiologist; or (2) the expert medical decision ultimately made by the intraprofessional panel—that is, the affirmation of Murphy's summary suspension. Our review concerns only the process employed in reaching that determination. Specifically, our review concerns whether Murphy was afforded a fair hearing. For the reasons that follow, we conclude that Murphy was not afforded a fair hearing.

¶ 91                                   2. *Murphy's Fairness Claim*

¶ 92    As outlined by BroMenn's medical staff bylaws, after the executive committee notified Murphy on June 1, 2016, of the summary suspension of his privileges, Murphy was entitled to challenge that determination by submitting a written request for an intraprofesssional conference, which Murphy accomplished the following day. In pursuit of his right to a fair hearing, Murphy sent BroMenn two separate written requests to inspect all the pertinent documentation BroMenn considered in determining that Murphy presented an immediate danger to the public, which predicated the summary suspension of his privileges. Murphy identifies BroMenn's subsequent response to his request for the pertinent documentation as the origin of his claim that he was denied his right to a fair hearing.

¶ 93    The crux of Murphy's claim concerns the absence of some pertinent documentation and the lack of specificity in other documents BroMenn did produce in response to his written requests. Specifically, Murphy directs our attention to (1) the four peer review medical records and two Midas reports underlying the executive committee's summary suspension determination that BroMenn failed to produce and (2) the lack of any identifying information or specificity in the two peer review summaries and eight Midas reports that BroMenn did tender. Murphy asserts that because of these deficiencies, he was prejudiced during the intraprofessional conference because he was unable to cross-examine statements made by Chu, Braastad, or Nevin that questioned the method and manner in which he provided care to his patients during the 18-month period BroMenn identified. Murphy also asserts that the

aforementioned deficiencies prevented him from presenting relevant evidence at the intraprofessional conference to refute the basis underlying the summary suspension of his privileges.

¶ 94　　Despite's Murphy fairness claim, the obvious initial question is, "To what extent did BroMenn's executive committee rely on the peer reviews and Midas reports in reaching its conclusion to summarily suspend Murphy's privileges?" If, for example, the record showed that the executive committee did not place any substantial significance on the four peer review cases and 10 Midas reports when making its determination to suspend Murphy's privileges, any error in not producing those documents might be considered harmless. We need not, however, speculate as to the answer to that question because Nevin testified at the intraprofessional conference that the executive committee's consideration of those additional cases "mattered" because during a period spanning "18 months, there were four peer review cases [and] ten other reports of inadequate documentation[ ] and based on this, the feeling was: time out." Thus as framed by Nevin, BroMenn's vice president for medical management, Murphy's care of E.W. was the latest case in a series of cases spanning 18 months that revealed a pattern warranting the summary suspension of his privileges. Indeed, at the intraprofessional hearing, Tecson confirmed to Bernardi that the four peer review cases and 10 Midas reports at issue in this case formed part of the basis for the summary suspension of Murphy's privileges.

¶ 95　　In response to Murphy's claims regarding the lack of documentation and specificity of the four peer review reports at issue, BroMenn asserts that in addition to providing E.W.'s complete medical record—which Murphy does not dispute—BroMenn also provided Murphy the complete medical record of M.A., who was the 92-year-old patient described in the December 2014 peer review worksheet. However, in his reply brief to this court, Murphy disputes receiving M.A.'s medical record, noting that BroMenn failed to provide that record at the June 2016 intraprofessional conference or list it as an exhibit. Nonetheless, we need not resolve that dispute because BroMenn fails to explain why, in providing Murphy M.A.'s complete medical record, it did not also provide Murphy the complete medical record of the 58-year-old patient who was the subject of the accompanying April 2015 peer review worksheet.

¶ 96　　With regard to the remaining two peer review cases that BroMenn failed to provide to Murphy at all, BroMenn explains that because those two cases were recent, "the outside [peer] review [process] had not yet been completed, so there were no reports for those patients to produce to *** Murphy." We note, however, that although Chu's testimony at the intraprofessional conference confirmed that the two recent cases had yet to be peer reviewed, he testified further that the executive committee nonetheless discussed those cases because of patient safety concerns. Thus, at a minimum, BroMenn should have (1) disclosed the identity of the patients involved in those two cases and (2) provided a brief synopsis of the specific safety concerns raised by the executive committee. BroMenn failed to do so.

¶ 97　　BroMenn also disputes Murphy's claim that the Midas reports at issue lacked specificity. On this subject, BroMenn posits that the eight disclosed Midas reports "provide[d] a detailed description of the complaints associated with the care provided by *** Murphy, and his failure to complete documentation and medical records." We disagree.

¶ 98　　As best we can tell, the 10 Midas reports at issue represent synopses of medical care provided to unidentified patients during a brief, specific moment in time over the span of an 18-month period from the first-person perspective of an unidentified member of BroMenn's

medical staff. We agree with Murphy that without identifying, at the very least, the authors of the 10 Midas reports, it would be nearly impossible to glean any meaningful information sufficient to mount a defense against a claim that the 10 Midas reports collectively support a finding sufficient to warrant summary suspension of privileges.

¶ 99    In this case, the record shows that after considering E.W.'s case, four separate peer review cases, and 10 Midas reports, BroMenn's executive staff detected a pattern of inadequate medical care sufficient to warrant the summary suspension of Murphy's privilege to practice medicine at BroMenn. After Murphy exercised his right to a fair hearing afforded by filing a request for an intraprofessional conference, Murphy requested further all pertinent information that BroMenn's executive committee considered in substantiating its summary suspension determination as permitted by BroMenn's medical staff bylaws. We conclude that BroMenn failed to comply with it disclosure obligations to Murphy, which, as a result, denied Murphy a fair hearing. In so concluding, we reverse the trial court's finding that BroMenn's mere identification of the four peer review cases and 10 Midas reports, without providing Murphy the substance of those reports, was sufficient to comply with the disclosure requirements of its medical staff bylaws. Accordingly, we reverse and remand with directions for a fair intraprofessional conference to be conducted.

¶ 100                              III. CONCLUSION

¶ 101    For the reasons stated, we reverse the trial court's judgment and remand for further proceedings. In so holding, we note that this decision does not bar BroMenn from seeking again to suspend Murphy's clinical privileges.

¶ 102    Reversed; cause remanded.

¶ 103    JUSTICE HARRIS, dissenting.

¶ 104    I respectfully dissent. This appeal relates only to the propriety of the trial court's denial of Murphy's emergency motion for a temporary restraining order and preliminary injunction and not the merits of the underlying complaint for declaratory and injunctive relief which remains pending in the trial court. I will confine my analysis accordingly.

¶ 105    Our supreme court recognized the " 'rule of non-review' " in *Adkins*, 129 Ill. 2d at 506, 544 N.E.2d at 737-38. Under this rule, internal staffing decisions of private hospitals are not subject to judicial review except when the decision results in the impairment or elimination of existing staff privileges. *Id.* "In such cases, the hospital's action is subject to a limited judicial review to determine whether the decision made was in compliance with the hospital's bylaws." *Id.* at 506-07, 544 N.E.2d at 738. *Adkins* further held that a court may reverse the decision of the hospital not only where it has not followed its bylaws but also where "actual unfairness" on the part of the hospital is demonstrated in the record. *Id.* at 514, 544 N.E.2d at 741.

¶ 106    To be entitled to a preliminary injunction, the moving party must establish "(1) a clearly ascertained right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the case." *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 62, 866 N.E2d 85, 91 (2006). The moving party must raise a "fair question" as to each required element to obtain an injunction. *Clinton Landfill, Inc. v. Mahomet Valley Water Authority*, 406 Ill. App. 3d 374, 378, 943 N.E.2d 725,

729 (2010). We review a trial court's grant or denial of a preliminary injunction for an abuse of discretion. *Id.* An abuse of discretion occurs only where the ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view. *Id.*

¶ 107    Murphy's appeal centers on the "likelihood of success on the merits" element. He argues he presented a fair question that BroMenn violated its bylaws when "he was forced to proceed in a hearing where patients were not identified and medical charts were not provided." Specifically, Murphy asserts BroMenn "did not provide [him] with the medical charts associated with the 'four peer review cases' and 'ten other reports of inadequate documentation and/or management' alleged in the June [1, 2016,] [n]otice, despite the fact that he requested that information in advance of the [intraprofessional conference] on more than one occasion." Murphy also argues he was denied the ability to effectively cross-examine BroMenn's witnesses and call his own witnesses due to its failure to identify the patients in the "four peer review cases" and "ten other reports."

¶ 108    Murphy does not identify any bylaw which required BroMenn *sua sponte* to produce the medical charts or identifying information of the patients in the "four peer review cases" and "ten other reports." The only bylaw which addresses the disclosure of information in the context of an intraprofessional conference is article IX, section IV(B), which states: "The affected individual is entitled, upon timely and advanced written request, to inspect all pertinent and non-privileged information in [BroMenn's] possession prior to the [i]ntraprofessional [c]onference." This bylaw does not impose a disclosure obligation on BroMenn in the absence of a written request by the physician. Thus, we must look at Murphy's written requests and BroMenn's responses to determine if the bylaw was violated or "actual unfairness" occurred.

¶ 109    In its June 1, 2016, notice, BroMenn identified nine separate bases for its summary suspension decision. Eight of the nine bases related to Murphy's care provided to E.W. The ninth basis was that "[i]n addition in the past 18 months, Dr. Murphy has had four peer review cases and ten other reports for inadequate documentation and/or management." Murphy premises his claim that he requested the medical charts and identifying information for the patients referred to in the "four peer review cases" and "ten other reports" on two letters his attorneys sent to BroMenn, one dated June 2, 2016, in which he requested an intraprofessional conference, and the other dated June 6, 2016, in which he requested copies of certain "documents and information." As demonstrated below, neither letter supports Murphy's claim.

¶ 110    Regarding the June 2, 2016, letter, Murphy's attorneys wrote, in part:

"Please be advised that this request for an [i]ntra-professional [c]onference assumes that all documentation on which the summary suspension is based has been provided to our office, as counsel for Dr. Murphy, expeditiously. See Article VIII, Section II.A of the Medical Staff Bylaws ("[T]he Executive Committee shall meet to review the documentation upon which the summary suspension is based, and recommend whether it should be affirmed, lifted, expunged or modified[.]"). The [c]onference will be rendered useless if Dr. Murphy is not provided with all documentation on which the summary suspension was based and given an opportunity to review said documentation in advance of the [c]onference. A written request for said documentation has been submitted to Associate General Counsel, Mary Matthews today.

Nothing in Murphy's June 2 letter indicates he requested the medical charts or identifying information of the patients in the "four peer review cases" and "ten other reports." Nor does

- 22 -

Murphy argue that the medical charts and identifying information of these other patients were part of the "documentation on which the summary suspension was based," which was the parameter of the request in his June 2 letter.

¶ 111 Murphy's June 6, 2016, letter to BroMenn is the written request for documents referenced in the June 2, 2016, letter. The June 6 letter sets forth eight separate requests for documents. On appeal, Murphy does not identify which of the eight requests for documents supports his assertion he specifically requested the medical charts and identifying information of the patients in the "four peer review cases" and "ten other reports." The only potentially relevant requests are the following:

"3. All internal or external reviews of any of *** Murphy's medical charts or patient care rendered by *** Murphy;

***

5. All witness statements gathered during any investigation of *** Murphy;

* * *

8. A list of any and all witnesses that the *** [e]xecutive [c]ommittee intends to present and all documents that will be introduced at the [i]ntraprofessional [c]onference."

None of the above requests specifically identify the medical charts or identifying information of the patients in the "four peer review cases" and "ten other reports." Further, it does not appear that the medical charts or identifying information for these other patients were "documents that [were] introduced at the [i]ntraprofessional [c]onference" as requested by Murphy in paragraph 8. Based on my review of the transcript of the intraprofessional conference, the only documents referred to by witnesses were those which BroMenn had previously provided to Murphy. I find no mention made during BroMenn's presentation at the intraprofessional conference of any medical charts or patient identifiers which had not already been supplied to Murphy.

¶ 112 Here, it is apparent that Murphy and his attorneys entered the intraprofessional conference aware that his summary suspension had been based, in part, on the "four peer review cases" and "ten other reports," and that BroMenn intended to refer to these cases and reports at the intraprofessional conference. It is also apparent that Murphy did not request the medical charts or identifying information for these patients prior to the hearing. Instead, he waited until the intraprofessional conference had convened before he objected. Whether as a matter of strategy or simply due to an oversight, Murphy engaged in the review process without first obtaining documents he knew might be pertinent to the proceedings and which he did not possess. Further, at the point his objections to this evidence were overruled by the hearing officer, he failed to request a continuance of the intraprofessional conference. See *Rao v. St. Elizabeth's Hospital of the Hospital Sisters of the Third Order of St. Francis*, 140 Ill. App. 3d 442, 457-58, 488 N.E.2d 685, 696 (1986) (suspended physician could not claim prejudice where he failed to request a continuance of a review hearing notwithstanding his claim he was not given medical charts necessary for his cross-examination of witnesses).

¶ 113 In my view, Murphy has not presented a fair question of a violation of a bylaw or of "actual unfairness" in regard to BroMenn's disclosures. He has failed to establish BroMenn had an obligation to *sua sponte* furnish him with medical charts and identifying information for the patients involved in the "four peer review cases" and "ten other reports," or that it failed to

comply with his requests for documents. The question on appeal is whether the trial court abused its discretion in finding Murphy failed to establish a likelihood of success on the merits in his request for a preliminary injunction. I would find it did not abuse its discretion and would affirm.